IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SANDRA FELIX, as Personal
Representative of the Estate of
Thomas Felix, Jr.,

      Plaintiff,

vs.                                                                           No. CIV 04-0374
JB/RLP

BERNALILLO COUNTY, a local
public body of the State of New Mexico,
CITY OF ALBUQUERQUE, a local
public body of the State of New Mexico,
BERNALILLO COUNTY SHERIFF'S
DEPARTMENT, and CORRECTIONAL
MEDICAL SERVICES, INC.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Bernalillo County Sheriff's Department's Motion for Summary Judgment, filed April 5, 2005 (Doc. 56). The Court held a hearing on this matter on June 13, 2005. The primary issue is whether the Defendant Bernalillo County Sheriff's Department ("the Department") is subject to municipal liability under 42 U.S.C. § 1983. Consistent with the Court's ruling at the hearing on this motion, and for the reasons given at the time of the hearing, the Court will grant the Department's motion and dismiss the § 1983 claims with prejudice. The Court will dismiss without prejudice all remaining claims -- all of which sound in state law.

**FACTUAL BACKGROUND**

This lawsuit arises out of Tomas Felix's suicide on August 10, 2002.[1] The material facts are not in dispute.

On August 9, 2002, Bernalillo County Sheriff's Department, Violent Crimes Detectives Jason Katz and Augustine Lucero, investigated a report of alleged crimes that had occurred that day. See Affidavit of Jason Katz ¶¶ 1, 2, 3, at 1 (executed April 4, 2005)(hereinafter "Katz Aff."); Affidavit of Augustine Lucero ¶¶ 1, 2, 3, at 1 (executed March 31, 2005)(hereinafter "Lucero Aff."). The alleged crimes that the detectives investigated included aggravated burglary, aggravated battery against a household member, kidnapping, unlawful taking of a motor vehicle, abuse of a child, intimidation of a witness, and aggravated stalking. See Katz Aff. ¶ 3, at 1. After conducting the initial investigation, the detectives determined that the suspect in the crimes was Felix. See Katz Aff. ¶ 4, at 1; Lucero ¶ 4, at 1.

Katz subsequently obtained an arrest warrant from the Honorable James F. Blackmer, State of New Mexico, County of Bernalillo, Second Judicial District Court Judge, authorizing Felix' arrest. See Katz Aff. ¶ 5, at 2; Lucero ¶ 5, at 1-2. Based upon information subsequently received by the detectives as to Felix' whereabouts, the detectives went to a business located on Yale Boulevard in Albuquerque, New Mexico on August 9, 2002. See Katz Aff. ¶ 6, at 2; Lucero Aff. ¶ 6, at 2. Upon arrival at the business on Yale, the detectives observed an individual, later identified as Jose Ramirez, standing near the business. See Katz Aff. ¶ 7, at 2; Lucero Aff. ¶ 7, at 2.

The detectives approached Ramirez and identified themselves as Sheriff's Detectives. See

---

[1] Because the Plaintiff, Sandra Felix, is the decedent's mother and has the last surname, for clarity, the Court will refer to the Plaintiff as "Mrs. Felix," and the decedent as "Felix."

Katz Aff. ¶ 7, at 2; Lucero Aff. ¶ 7, at 2. Ramirez informed the detectives that he was waiting for Felix, who would be driving Ramirez' purple Cavalier. See Katz Aff. ¶ 8, at 2; Lucero Aff. ¶ 8, at 2. The Cavalier driven by Felix subsequently arrived at a nearby business, and Ramirez went to and got into the Cavalier. See Katz Aff. ¶ 9, at 2; Lucero Aff. ¶ 9, at 2.

The detectives then followed the Cavalier in an unmarked Sheriff's Department vehicle and requested that the Albuquerque Police Department initiate a traffic stop of the Cavalier. See Katz Aff. ¶ 10, at 2; Lucero Aff. ¶ 10, at 2. When APD marked patrol units attempted to stop the Cavalier, the driver, Felix, refused to yield to the patrol units' emergency lights and siren. See Katz Aff. ¶ 11, at 2; Lucero Aff. ¶ 11, at 2. Instead, Felix attempted to elude the police, resulting in a vehicle pursuit. See id.

Eventually, the APD were forced to collide with the Cavalier to bring it to a stop at the intersection of Gibson Boulevard and San Mateo Boulevard. See Katz ¶ 12, at 2; Lucero Aff. ¶ 12, at 2. After stopping the Cavalier, numerous uniformed APD officers ordered Felix out of the Cavalier at gunpoint and instructed him to lie on the ground. See Katz Aff. ¶ 13, at 3-4. Felix immediately exited the Cavalier and complied with the APD officers' commands without resistance and without making any effort to confront the armed officers. See id.

The officers then placed Felix under arrest and Sheriff's Deputy Shaun Sanchez transported Felix from the site of his arrest to the Sheriff's Department Headquarters at Fourth, N.W. and Roma, N.W. in Albuquerque. See Katz Aff. ¶ 14, at 3; Affidavit of Shaun Sanchez ¶¶ 2, 3, 4, at 1-2 (executed April 1, 2005)(hereinafter "Sanchez Aff."). Katz subsequently attempted to interview Felix at the Sheriff's Headquarters. See Katz Aff. ¶ 15, at 3. After Katz advised Felix of his constitutional rights, Felix stated to Katz that he wanted to talk to his attorney before making any further statement.

See Katz Aff. ¶ 16, at 3.

Katz and Lucero then took Felix to the Bernalillo County Detention Center ("BCDC") and turned him over to BCDC's custody sometime between 3:30 a.m. and 4:00 a.m. on August 10, 2002. See Katz Aff. ¶ 17, at 3; Deposition of Augustine Lucero at 87:4-9 (taken March 3, 2005). Upon his arrival at BCDC, a trained medical care provider screened Felix. See Affidavit of Jonathan Polner ¶¶ 2-3, at 1 (executed January 12, 2005); Correctional Medical Services Medical History and Screening at 1-2 (dated August 10, 2002).[2] At that time, Felix denied any suicidal thoughts or the need to be seen by a mental health provider during this intake screening process. See Correctional Medical Services Medical History and Screening ¶¶ 3-5, at 2 (responding "NO" to "Have you ever attempted suicide?"; "Are you suicidal now?"; and "Do you plan to injure yourself?").

Katz, Sanchez, and Lucero have been trained on and have experience in suicide prevention and in responding to individuals that are at risk of committing suicide or harming themselves. See Katz ¶¶ 20, 21, at 3; Sanchez Aff. ¶¶ 6, 7, at 2; Lucero Depo. at 9:3-18, 30:4 - 33:15. In one instance, Lucero responded to a suicide call where a person expressed concern for the safety of a friend whereby, under similar circumstances, the person was placed under protective custody with just the friend's concerns. See Lucero Depo. at 33:8 - 39:2. Pursuant to the Bernalillo County Sheriff's Department Standard Operating Procedures, if a Sheriff's Deputy has evidence to support a belief that an individual has attempted suicide, or presents a risk of serious harm to himself or

---

[2] Mrs. Felix disputes all of the facts until this point with the same statement: "Plaintiff *disputes* Defendant's statement and in direct contravention states that the crimes being investigated were alleged, and Mr. Tomas Felix was never convicted of such crimes." Response ¶¶ 1-16, at 3-5. While the Court acknowledges that the arrest of -- and events following the arrest of -- Felix involved charges for which Felix was never convicted, this fact is immaterial to the considerations before the Court in this motion and, thus, does not create a genuine issue of material fact on any of Defendant's factual contentions contained in paragraphs one through sixteen.

herself, the Deputy can place the person in protective custody and transport the person to a mental health facility, specifically, the University of New Mexico Health Center. See Lucero Depo. at 46:8 - 47:25.

The Plaintiff, Sandra Felix, does not deny that a BCDC medical professional screened Felix. Instead, Mrs. Felix argues that the medical intake screening was deficient because Katz and Lucero garnered information from Ramirez which, according to Mrs. Felix, indicated Felix was suicidal, but Katz and Lucero did not share this information with the BCDC's medical care provider. See Response ¶ 17, at 6. Shortly after stopping the Cavalier, Lucero interviewed the passenger, Ramirez. See Lucero Aff. ¶¶ 13, 14, at 2. In his interview, Ramirez described Felix as not acting like himself, seeming nervous, not making sense, and acting unreasonably as he tried to evade police. See Transcript of Proceedings, Interview of Jose Ramirez at 10:8-16; id. at 10:19; id. at 14:16-19; id. at 15:6-14 (dated August 10, 2002)(hereinafter "Ramirez Interview"). Ramirez also told the detectives that Felix repeatedly told Ramirez "kill me," id. at 14:9-13; id. at 14:16-19; id. at 15:3-4; Lucero Aff. ¶ 15, at 3, which Mrs. Felix contends indicates a desire to commit suicide. Ramirez told the detectives that Felix' ex-girlfriend told him that Felix had, in another instance, pointed a gun at himself and said that he was going to take his girlfriend's, his child's and his own life. See Ramirez Interview at 4:1-3. Lucero did not understand these statements as a suicide threat by Felix, nor did Ramirez present it as a suicide threat by Felix. See Lucero Aff. ¶ 15, 17, at 3. Ramirez did not believe that Felix had a plan to take his own life when he was taken into custody on August 9, 2002. See Ramirez Depo. at 109:23 - 111:4.

Katz, Lucero, and Sanchez have testified that they did not learn anything from Ramirez or from any other person that led any one of them to believe Felix was suicidal or would harm himself.

See Katz Aff. ¶ 23, at 4; Lucero Aff. ¶ 19, at 3; Sanchez Aff. ¶ 9, at 2.  Katz, Lucero, and Sanchez have testified that, under the circumstances present on August 9 and 10, 2002, there was nothing to suggest or indicate to any of the Sheriff's Deputies involved that Felix was suicidal or planning to harm himself.  See Katz Aff. ¶ 24, at 4; Lucero Aff. ¶ 20, at 3; Sanchez Aff. ¶ 10, at 2.  The detectives have testified that Felix did not say or do anything in the presence of Katz, Lucero, or Deputy Sanchez, nor was there anything in Felix' demeanor, that led any of these officers to believe that Felix was suicidal or contemplating any self-harm. See Katz Aff. ¶¶ 18, 19, 22, at 2; Lucero Aff. ¶ 18, at 3; Sanchez Aff. ¶ 8, at 2.  Nevertheless, Mrs. Felix contends that Felix' actions and the interview of Ramirez, when viewed under the totality of circumstances, gave notice to Katz and Lucero that Felix was suicidal.

Katz, Lucero, and Sanchez testified that, because there was nothing indicating that Felix was suicidal or planning to harm himself, these deputies did not inform anyone that they thought that Felix was suicidal or was contemplating self harm.  See Katz Aff. ¶ 25, at 4; Lucero Aff. ¶ 21, at 3; Sanchez Aff. ¶ 11, at 2.  Again, Mrs. Felix disputes this fact, averring that, when viewed under the totality of the circumstances, Katz and Lucero had clear notice that Felix was suicidal.

At the time of his suicide, Felix was housed in the BCDC on charges of aggravated burglary, aggravated battery against a household member, kidnaping, unlawful taking of a motor vehicle, abuse of a child, intimidation of a witness, and aggravated stalking.  All charges are related to the kidnaping of his ex-girlfriend, Raquel Villegas, and his abandonment of the couple's three-year old child.  Felix, however, committed suicide before the charges against him proceeded to an acquittal or a conviction.

Mrs. Felix spoke by telephone with Felix twice on August 10, 2002 while Felix was in BCDC. See Deposition of Sandra Felix at 9:1 - 10:15 (taken December 15, 2004).  At no time during either

of these conversations did Felix say anything to his mother that led her to believe that Felix was considering suicide or self harm.  See id. at 10:8 - 12:20.

Felix also spoke with a friend, Rosalina Trujillo, while in jail on August 10, 2002.  See Deposition of Rosalina Trujillo at 17:21 - 18:17 (taken March 3, 2005)(hereinafter "Trujillo Depo."). He asked Trujillo to contact his attorney, Dan Baca, but then told Trujillo to forget about calling Dan Baca because he did not know for how long he would be incarcerated.  See id. Nothing during her conversation with Felix, however, led Trujillo to believe that Felix was considering suicide or self harm.  See id. at 19:2-8; id. at 20:5-7.  Mrs. Felix contends, however, that Katz and Lucero had notice that Felix was suicidal, regardless whether Felix told his mother or his acquaintance, Rosalina Trujillo, that he was going to commit suicide that day.

Felix was found hanging in his cell in BCDC on August 10, 2002 at approximately 7:53 p.m. See Amended Complaint ¶ 33, at 5.

## PROCEDURAL BACKGROUND

Mrs. Felix brings her claims against the Sheriff's Department for due process violations pursuant to 42 U.S.C. § 1983 and for negligence pursuant to the New Mexico Tort Claims Act. Mrs. Felix' § 1983 claims are against the Sheriff's Department and not against any of its individual deputies.  See Amended Complaint ¶¶ 38-53, 58-77, at 5-8, 9-11.  The Sheriff's Department moves, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment.

## STANDARDS FOR DECIDING SUMMARY JUDGMENT MOTIONS

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden

of establishing the absence of any genuine issue of material fact. See id. at 323. The moving party can meet the burden by highlighting for the court an insufficiency of evidence as to an essential element of the nonmovant's claim. See id. Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 324).

The non-moving party may not rest on his pleadings, but must set forth specific facts. See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Under rule 56(e), only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief. See Tavery v. United States, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994). "A plaintiff cannot create a triable issue of fact by making an assertion without supporting facts." Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1177 (10th Cir. 2000).

For the purposes of summary judgment, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff[,]" the court should deny summary judgment. MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991)(quoting Palucki v. Sears, Robueck & Co., 879 F.2d 1568, 1570 (7th Cir. 1989)).

A court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. A "genuine" factual dispute requires the non-moving party to show more than a mere "scintilla of evidence" to overcome a motion for summary judgment. Id. at 252.

The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative. See id. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

## APPLICABLE LAW

It is important to emphasize that Mrs. Felix has not brought claims against the individual deputies. Instead, she has sued only the County, the City of Albuquerque, and the Department.[3] Accordingly, not only must Mrs. Felix establish that one of the deputies committed a constitutional violation, but she must also show that the Department had a policy or custom that was the motivating force behind the constitutional deprivation. See Winters v. Bd. of County Comm'rs, 4 F.3d 848, 855 (10th Cir. 1993)(applying municipal liability analysis under § 1983 in claims brought against a county

---

[3] The County and the City are not parties this motion, but they have brought a separate Motion for Summary Judgment. The Court incorporates by reference its Memorandum Opinion and Order in the Defendants Bernalillo County and the City of Albuquerque's Motion for Summary Judgment.

and its sheriff's department).

### 1. Due Process Claims.

"Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." Hocker by Hocker v. Walsh, 22 F.3d 995, 998 (10th Cir. 1994). Thus, a court must judge such claim against the "deliberate indifference to serious medical needs test of Estelle v. Gamble, 429 U.S. 97 (1976)." Id. (internal quotations and citations omitted). To meet this test, a plaintiff must demonstrate: (i) actual knowledge by the state actor of the specific risk of harm to the detainee, or that the risk was so substantial or pervasive that knowledge can be inferred; (ii) failure to take reasonable measures to avert the harm; and (iii) the state actor's failure justifies liability. See id. at 1000. When the facts fail to suggest knowledge of the specific risk or that the risk was so substantial or pervasive that knowledge can be inferred, the state actor cannot be said to have violated the detainee's constitutional rights. See id.

### 2. 42 U.S.C. § 1983.

There is no vicarious liability or respondeat superior liability under § 1983. See Monnell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978); Jantz v. Muci, 976 F.2d 623, 631 (10th Cir. 1992). A plaintiff suing a municipality pursuant to § 1983 for the acts of one or more of its employees must prove: "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998)(citing Monell v. Dep't of Social Servs., 436 U.S. at 694). See, e.g., Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120 (10th Cir. 1992); Wilson v. Meeks, 98 F.3d 1247, 1255 (10th Cir. 1996). The Tenth Circuit has applied

Monell's municipal liability standard in the context of a suit against a county and its sheriff's department. See Winters v. Bd. of County Comm'rs, 4 F.3d at 855 ("[F]or the County and the Sheriff's Department to be liable under § 1983 the constitutional violation must be a result of a government custom or policy." (citing Monell v. Dep't of Social Servs., 436 U.S. at 694)). Negligence alone is insufficient to establish liability against the governmental entity. See Woodward v. City of Worland, 977 F.2d 1392, 1400 (10th Cir. 1992). The plaintiff must plead and prove that the governmental entity was "deliberately indifferent" to the plaintiff. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); D.T. v. Indep. Sch. Dist., 894 F.2d 1176, 1192 (10th Cir. 1990).

## ANALYSIS

### I. THERE ARE NO GENUINELY DISPUTED ISSUES OF MATERIAL FACT.

There are no factual disputes that might affect the outcome of the suit under governing law. The Department does not dispute that Ramirez told Lucero that, during the police chase, Felix exclaimed repeatedly, "Kill me." Felix also highlights that Felix' ex-girlfriend told Ramirez that Felix had told her on an earlier occasion that he was going to kill her, their child, and himself, and that Ramirez told this to Lucero. The Department does not contest that Ramirez informed Lucero of this alleged incident, but instead argues that this statement offers no support for Felix' notion that Defendant Lucero was notified of Felix' suicidal tendencies. The parties do not dispute, however, what Ramirez told Lucero. Thus, the issues turns on whether this evidence is sufficient to establish Lucero's and Katz' actual knowledge or notice that Felix was suicidal, a task the Court undertakes in the following section. On the record before it, the Court concludes that no genuine material facts are in dispute.

### II. THE SHERIFF'S DEPARTMENT IS ENTITLED, AS A MATTER OF LAW, TO

**JUDGMENT IN ITS FAVOR ON ALL OF FELIX' FEDERAL CLAIMS.**

Mrs. Felix did not sue Lucero or Katz, but only the Department. Thus, she assumes the burden of showing that some Department policy or custom was the motivating factor behind the alleged constitutional deprivation. Mrs. Felix offers no evidence to support this essential element.

### A.  THE EMPLOYEES OF THE SHERIFF'S DEPARTMENT DID NOT VIOLATE FELIX' CONSTITUTIONAL RIGHTS.

Felix has not demonstrated that there is a genuine issue of material fact whether a Department employee violated his constitutional rights. Specifically, Felix has not demonstrated a genuine issue of material fact whether Lucero, Katz, or Sanchez -- the only Department employees who had contact with Felix -- violated Felix' due process rights by not diagnosing him as suicidal and then having him involuntarily committed to a mental health facility.

Mrs. Felix concedes that none of the deputies had actual knowledge of the specific risk of harm to her son. See Transcript of Hearing at 16:4-9; 19:10-20 (taken June 13, 2005).[4] Instead, she argues that the evidence creates a genuine issue of material fact "that the risk was so substantial or pervasive that knowledge can be inferred." Hocker by Hocker v. Walsh, 22 F.3d at 1000 (quoting Berry v. City of Muskogee, 900 F.2d 1489, 1498 (10th Cir.1990))(quotation omitted). The Court does not believe the undisputed facts could support a finding that this element has been met.

None of the Department deputies who encountered Felix had actual knowledge that Felix was suicidal. The deputies have so testified, and Mrs. Felix has not created a genuine issue of material fact that they had actual knowledge. Instead, what Katz and Lucero knew was that Felix was a suspect in numerous crimes, which included aggravated burglary, aggravated battery against a

---

[4] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any finalized transcript may contain slightly different page and/or line numbers.

household member, kidnaping, unlawful taking of a motor vehicle, abuse of a child, intimidation of a witness, and aggravated stalking.  What they also knew is that, when they tried to arrest Felix, he initially attempted to elude them, taking the detectives and several marked APD patrol units on a vehicle pursuit through southeast Albuquerque.

The detectives were also aware that, when APD forcibly stopped the car Felix was driving, uniformed police officers ordered Felix, at gunpoint, to exit the car.  Felix did not make any attempt to confront the armed officers or to force the officers to employ deadly force; he did not attempt "suicide by cop."  Department's Motion at 10.  Instead, he readily complied with the officers' commands to exit his vehicle and to get to the ground.

After he was arrested, Sanchez transported Felix from the site of his arrest, at the intersection of Gibson Boulevard and San Mateo Boulevard to the Sheriff's Department Headquarters at Fourth Street and Roma Avenue in Albuquerque.  At no time while he was in Sanchez's custody did Felix say or do anything, nor was there anything in his demeanor, that led Sanchez to suspect that Felix was suicidal or at risk of self harm.

Katz then interviewed Felix at the Sheriff's Headquarters.  Rather than make any suicidal threats or gestures, or ask Katz for help, Felix refused to answer Katz's question, instead demanding his right to speak with his attorney.  Katz and Lucero then took Felix to the BCDC and released him to BCDC's custody.  In short, in reviewing all of the circumstances present and known to the Sheriff's Department detectives on August 9 and 10, 2002, as of the time these detectives left Felix in BCDC's custody, neither had heard or seen anything, from Felix or anyone else, which suggested that Felix was suicidal or contemplating self harm.

Felix argues that Lucero "knew or should have known" that Felix was allegedly suicidal based

on Lucero's interview of Ramirez.  Putting aside that this negligence standard is not the standard for a constitutional violation, the Court does not believe the Ramirez interview presented Lucero with a "risk [that] was so substantial or pervasive that knowledge can be inferred."  Hocker by Hocker v. Walsh, 22 F.3d at 1000 (quoting  Berry v. City of Muskogee, 900 F.2d 1489, 1498 (10th Cir.1990))(quotation omitted).  Although Ramirez reported to Lucero that, during the pursuit, Felix reportedly stated to Ramirez "kill me,"  Lucero did not understand this statement to be a suicide threat by Felix, nor did Ramirez present it as a suicide threat by Felix.  That Felix was not himself was obvious from his extraordinary conduct on that day, but police confront people every day who do unusual and criminal acts yet are not suicidal; not being oneself, being extremely nervous, not making sense, and being unreasonable do not, alone, present a "risk [that] was so substantial or pervasive that knowledge can be inferred."  Id.  Ramirez' hearsay comment from an ex-girlfriend about a separate incident do not amount to knowledge.  While the totality of circumstances might create an issue of fact about negligence, the totality of circumstances did not present a "risk [that] was so substantial or pervasive that knowledge can be inferred."  Id.  Indeed, Ramirez did not believe the "kill me" statement or any others by Felix on August 9, 2002 to be suicide threats.  Specifically, despite any statement made by Felix or by anyone else to Ramirez, Ramirez testified that he did not believe that Felix had a plan to take his own life when he was taken into custody on August 9, 2002.

Under these facts, there is not evidence that the deputies who encountered Felix on August 9 and August 10, 2002 had reason to know Felix was suicidal or that a risk of suicide was so substantial or pervasive that the deputies should have known that Felix was suicidal.  The one individual upon whom Mrs. Felix relies to establish the alleged knowledge, Ramirez, disclaimed any belief that, at the time Felix was taken into custody, Felix was contemplating suicide.  Felix' mother

and one of his friends -- both of whom spoke to Felix after he had left the deputies' custody -- echoed that Felix was not saying or doing anything that would suggest he was suicidal.

Given that there is no evidence that the deputies had any actual knowledge that Felix was suicidal, and the lack of facts that would support the notion that such risk was substantial or pervasive, Felix has not demonstrated that a County employee violated Felix' rights. Mrs. Felix therefore cannot succeed with her constitutional claim against the Department.

Therefore, the Department is entitled to judgment in its favor on Mrs. Felix' federal claims. Mrs. Felix' federal claims against the Sheriff's Department fail because she cannot show a constitutional violation. The Court will dismiss Mrs. Felix' federal claims with prejudice.

### B.   THERE IS NO EVIDENCE OF A CUSTOM OR POLICY MOTIVATING ANY CONSTITUTIONAL DEPRIVATION.

It is important that Mrs. Felix brings his § 1983 claim against the Sheriff's Department and not against any of its employees. Mrs. Felix must prove that the Department was deliberately indifferent to her decedent's rights. Mrs. Felix cannot make this showing.

Even assuming that Mrs. Felix established that the deputies violated Felix' constitutional rights, the Department is nonetheless entitled to summary judgment on the § 1983 claims because there is no evidence that a Department custom or policy was the motivating factor behind any such constitutional deprivation. Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998). The Department trained the deputies in suicide prevention. A trained medical professional screened Felix. There is no evidence of a policy or custom that was the motivating factor behind the alleged constitutional deprivation. Indeed, the record shows, without any contradiction, that the Department has taken affirmative steps to prevent such occurrences.

Moreover, to the extent that Mrs. Felix argues that the deputies acted negligently, negligence alone is insufficient to establish liability against the governmental entity. See Woodward v. City of Worland, 977 F.2d 1392, 1400 (10th Cir. 1992). The plaintiff must plead and prove that the governmental entity was "deliberately indifferent" to the plaintiff. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); D.T. v. Indep. Sch. Dist., 894 F.2d 1176, 1192 (10th Cir. 1990). Mrs. Felix has made no such showing.

Accordingly, the Court will grant summary judgment in favor of the Department on the § 1983 claims.

## III. THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS AGAINST THE DEPARTENT.

Having dismissed the claims against the Department over which the Court had original federal jurisdiction, and in separate opinions having dismissed all federal claims against the other Defendants, the Court, pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the state law claims against the Department. See Pruitt v. Comcast Cable Holdings, LLC, 100 Fed. Appx. 713, 717 (10th Cir. June 3, 2004)(unpublished decision)(holding that the district court's refusal to exercise supplemental jurisdiction over plaintiff's state law contract claims after dismissing all federal claims was "clearly authorized under 28 U.S.C. § 1367(c)(3)"). Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, [a] district court[] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." A district court, however, "may decline to exercise supplemental jurisdiction . . . if[:]"

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The third provision applies to this case. The Court has dismissed the claims on which it had original jurisdiction -- the § 1983 claims. The remaining claims sound in state law.

The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it. In United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966), decided more than twenty years before Congress passed 28 U.S.C. § 1367, the Supreme Court addressed the federal district courts' ability to exercise jurisdiction over state law claims. In explaining that such power existed, the Supreme Court noted that it "need not be exercised in every case in which it is found to exist." Id. at 726. The Supreme Court continued:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Id. (footnotes omitted). See Bd. of County Comm'rs v. Geringer, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002)("[T]he district court's ruling [in which it declined to review the state law claims] comports with our general admonishment that district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial . . . .").

Although there are similar elements between the federal law and New Mexico law, there are

also important differences. Because the Court, by resolving the federal claim, need not address all state law elements, the Court declines to exercise supplemental jurisdiction over these remaining state law claims. The state court is the more appropriate forum to resolve whether the Department's actions constituted torts under New Mexico law.

**IT IS ORDERED** that Defendant Bernalillo County Sheriff's Department's Motion for Summary Judgment is granted on Plaintiff Sandra Felix' § 1983 claims against the Bernalillo County Sheriff's Department, and will dismiss all claims against the Bernalillo County Sheriff's Department with prejudice. The Court will dismiss without prejudice all remaining claims against the Bernalillo County Sheriff's Department -- all of which sound in state law.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Augustine M. Rodriguez, Jr.
Albuquerque, New Mexico

   *Attorney for the Plaintiff*

William D. Slease
Jonlyn M. Martinez
Slease & Martinez, P.A.
Albuquerque, New Mexico

   *Attorneys for Defendant Bernalillo County Sheriff's Department*

Jeffrey L. Baker

Baker Law Firm
Albuquerque, New Mexico

*- and -*

William D. Slease
Jonlyn M. Martinez
Slease & Martinez, P.A.
Albuquerque, New Mexico

    *Attorneys for Defendant Bernalillo County*

Deborah D. Wells
Kennedy, Moulton & Wells, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Correctional Medical Services, Inc.*